IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISON

| | | |
|---|---|---|
| DIAMOND DASHAY YOUNG, | ) | CASE NO. 1:21-CV-00553-CAB |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | CARMEN E. HENDERSON |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

**I.     Introduction**

Plaintiff, Diamond Young, seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Young's Statement of Errors and AFFIRM the Commissioner's decision.

**II.    Procedural History**

On November 28, 2018, Young filed applications for SSI and DIB, alleging a disability onset date of May 2, 2017. (ECF No. 12, PageID #: 160, 162). The applications were denied initially and upon reconsideration, and Young requested a hearing before an administrative law judge ("ALJ"). (ECF No. 12, PageID #: 218). On May 26, 2020, an ALJ held a hearing, during which Young, represented by counsel, and an impartial vocational expert testified. (ECF No. 12, PageID #: 117). On June 26, 2020, the ALJ issued a written decision finding Young was not

disabled. (ECF No. 12, PageID #: 94). The ALJ's decision became final on January 7, 2021, when the Appeals Council declined further review. (ECF No. 12, PageID #: 83).

On March 9, 2021, Young filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 16, 17, 19). Young asserts the following assignments of error:

> (1) The ALJ failed to properly evaluate Ms. Young's multiple sclerosis. The ALJ's RFC for work at all exertional levels and only one multiple sclerosis-related postural limitation for never climbing ladders, ropes, or scaffolds is inconsistent with the evidence of record.
>
> (2) The ALJ failed to properly evaluate the opinion evidence from Dr. Koricke.

(ECF No. 16 at 3).

### III. Background

#### A. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Young's hearing:

> The claimant alleged that she was unable to perform work due to the limiting signs and symptoms of her severe impairments. The claimant testified that she had difficulty standing for a long time, walking distances, using her hands, and sleeping. She explained that she was not able to reach above her head. She stated that she had asthma and she used a nebulizer and inhaler when the weather changed. She testified that she needed to elevate her legs five times per day above her waist. The claimant also testified that she had trouble with focusing and needed to re-watch television or movies to understand them. In her adult function report, the claimant had difficulty with lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, seeing, using hands, memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (5E).

(ECF No. 12, PageID #: 104).

**B.      Relevant Medical Evidence[1]**

The ALJ also summarized Young's health records and symptoms:

> During the relevant period, the claimant treated for MS. On August 17, 2017, the claimant attended an appointment with Sophia Woodson, CNP. Records note that the claimant was diagnosed with MS in 2012. She was treated with Tecfidera and was tolerating well and she reported having a stable gait and no trouble sleeping. Upon examination, the claimant's strength was 5/5 proximally and distally bilaterally. Her muscle tone was normal and finger-nose-finger testing was normal. The claimant's sensation was unremarkable to light touch. She was able to recall current events. The claimant's gait was stable. She exhibited negative Romberg's testing. Ms. Woodson diagnosed the claimant with multiple sclerosis. She noted that the claimant's neurological examination was stable. (6F, 35-38). Treatment records continued diagnostic imaging and follow up appointments with Ms. Woodson during the relevant period. (6F,7-9, 12- 15, 18-21, 25-28). A MRI of the brain from October 17, 2017 noted that since the prior study in 2016, there was an unchanged appearance of white matter lesions in the supra and infratentorial brain which are most consistent with a demyelinating disease such as multiple sclerosis, but none of the lesions demonstrate findings to suggest active demyelination. (6F, 32). A MRI of the brain from April 3, 2019 showed multiple hyperintensities consistent with multiple sclerosis that are similar in appearance and number to the previous examination, but there was no enhancement to suggest active inflammation. (6F, 10). Examination findings included intact short and long-term memory, the ability to follow commands and recall current events, 5/5 motor strength proximally and distally bilaterally, normal muscle tone, normal finger-nose-finger testing, unremarkable sensation to light touch, stable gait, and negative Romberg's testing. (6F, 7-9, 12-15, 18-21, 25-28). At times, the claimant reported symptoms of left leg numbness and tingling, headaches, and dizziness. (6F, 12-15, 18-21). In March 2018, September 2018, March 2019, and August 2019, Ms. Woodson noted that the claimant's neurological examination was stable and she continued the claimant on Tecfidera. (6F, 7-9, 12-15, 18-21, 25-28).
>
> On March 7, 2019, the claimant presented to the emergency room for complaints of a headache, dizziness, and lightheadness. Upon examination by Shanteria Dixon, MD, MPH, the claimant exhibited

---

[1] Young's challenge involves her multiple sclerosis and mental health impairments. As such, the Court's discussion of the medical record focuses solely on those two impairments.

mild horizontal nystagmus. However, she was well appearing. Her sensory and motor function were intact in the bilateral upper and lower extremities. The claimant's cranial nerves were inspected and intact. There was no finger to nose dysmetria. She had no alternating hand movement ataxia. Dr. Dixon diagnosed the claimant with a nonspecific headache and a history of multiple sclerosis. She was treated with a cocktail of headache medication. Upon reevaluation, the claimant was found to have resolution of her headache. She was discharged and instructed to follow up with her neurologist. (5F, 216-223).

On March 28, 2019, the claimant attended a consultative physical examination with Dorothy Bradford, M.D. She complained of headaches and dizziness from multiple sclerosis. She stated that her left leg would sometimes give out, but she did not use a mobility aid. Upon examination, the claimant's deep tendon reflexes were brisk at +3/4 and equal bilaterally. . . . There was no spinal tenderness and no costovertebral tenderness. She had normal strength in all muscle groups with a normal range of motion of all joints. Her gait was even and regular with no apparent limp, shuffle, or other disturbance. The claimant's cranial nerves were grossly intact. She had 5/5 and equal motor strength in all four extremities. The claimant demonstrated normal bilateral grasp, manipulation, pinch, and fine coordination. There was no focal neurological deficit or edema. Dr. Bradford stated that the claimant had well controlled multiple sclerosis and mild asthma. (3F).

The claimant returned for a neurological evaluation with Ms. Woodson on October 17, 2019. She reported that a few days prior she went to the emergency room for bilateral leg weakness and she felt as though her legs would give out when performing work that required a lot of standing, but she explained that she took Tecfidera and was tolerating it well. Upon examination, the claimant's strength was 5/5 proximally and distally bilaterally. Her muscle tone was normal and finger-nose-finger testing was normal. The claimant's sensation was unremarkable to light touch and her gait was stable. She exhibited negative Romberg's testing. She was alert, oriented, and able to follow commands and recall current events. Her short and long-term memory were intact. Ms. Woodson noted that the claimant's neurological examination was stable and she took Tecifidera that she was tolerating well. She explained that the claimant's last MRI from April 2019 was stable. She also noted that the claimant's neurological examination was stable, but the claimant was reporting bilateral leg weakness when she stood too long. Ms. Woodson continued the claimant on Tecfidera. (6F, 3-6). A MRI of the brain from November 1, 2019 showed moderate periventricular

4

> T2 FLAIR hyperintensity compatible with known demyelinating disease. There was no pathologic enhancement to suggest active demyelination. (6F, 1).
>
> With respect to the claimant's severe mental impairments, she attended a consultative psychological examination with Deborah Koricke, Ph.D. on April 1, 2019. She reported feeling sad, having a depressed mood, worrying and anxiety about her health, finances, and future and difficulties with sleep patterns and falling and remaining sleep. She denied that she was ever under the care of a mental health professional or had ever been prescribed medications for psychiatric reasons. Upon mental status examination, the claimant appeared depressed. She exhibited long latencies when responding to questions and problems with distractibility and inattention, but persisted and tried her best to concentrate. She experienced some difficulty expressing herself in that she would lose her train of thought and her memory for history was varied. She brought notes with her and referred to these. She struggled to maintain attention and concentration. She closed her eyes to concentrate and became flustered on some tasks. She needed lengthy or complex instructions to be broken down into small segments of information and repeated because of limited sustained attention. She presented with a flat affect and a restricted range of emotions. Her energy and motivation appeared low. The claimant's memory for history was fair to poor. She could perform serial sevens, but she lost focus during the task and had to start the task over. However, the claimant presented with a good appearance and her behavior was appropriate in that she was cooperative during the interview. She put forth consistently good effort and persisted to the end of the evaluation. The claimant was conscious, alert, oriented and able to understand proverbs. She appeared to be open in sharing information about her life. Her thinking was reality bound. The claimant demonstrated adequate insight and judgment into her situation. Dr. Koricke diagnosed the claimant with adjustment disorder with mixed anxiety and a depressed mood.

(ECF No. 12, PageID #: 106).

    **C.**    **Opinion Evidence at Issue**

        **1.**    **State Agency Reviewing Physicians**

Regarding physical limitations, State Agency physicians, Venkatachala Sreenivas, M.D. and Gail Mutchler, M.D., opined that Young could never climb ladders, ropes, or scaffolds and

she must avoid concentrated exposure to extreme heat and fumes, odors, dusts, gases, and poor ventilation. (ECF No. 12, PageID #: 138–39, 153–54). At the reconsideration level, Dr. Mutchler additionally suggested that Young must avoid concentrated exposure to extreme cold and hazards, including no unprotected heights and dangerous moving equipment. (ECF No. 12, PageID #: 169–70, 184–85). Finally, the consultative physical examiner, Dr. Bradford, concluded that Young has well controlled multiple sclerosis and had no activity restrictions. (ECF No. 12, PageID #: 397). The ALJ found these opinions persuasive, reasoning:

> They are supported by records that reflect treatment for MS and asthma and diagnostic imaging discussed above, as well as significant clinical findings from treatment records and the consultative physical examination that include very mild tenderness to palpation of the suprapubic area, mild horizontal nystagmus, and deep tendon reflexes that were brisk at +3/4 and equal bilaterally.

(ECF No. 12, PageID #: 108).

Regarding mental impairments, State Agency psychologists, Paul Tangeman, Ph.D. and Mary K. Hill, Ph.D., opined Young retained the ability to understand, remember, and follow one to two step tasks, carry out simple tasks that are not fast paced, relate appropriately as needed on a superficial level, and perform routine tasks in a static work setting. (ECF No. 12, PageID #: 140–42, 171–73). The ALJ found their opinions persuasive. He explained:

> They are supported by the significant mental status findings from the consultative psychological examination that include appearing depressed, exhibiting long latencies when responding to questions and problems with distractibility and inattention, difficulty expressing herself in that she would lose her train of thought and her memory for history was varied, bring notes to refer to, struggling to maintain attention and concentration, needing lengthy or complex instructions to be broken down into small segments of information and repeated because of limited sustained attention, presenting with a flat affect and a restricted range of emotions, low appearing energy and motivation, fair to poor memory for history, and losing focus during serials sevens and having to start the task over. (4F).

6

(ECF No. 12, PageID #: 109).

### 2. Consultative Psychological Examiner—Dr. Koricke

On April 1, 2019, Deborah Koricke, Ph.D., completed a disability referral report. (ECF No. 12, PageID #: 398). She made the following statements:

> Ms. Young had no difficulty understanding instructions in that she understood both simple and complex questions and instructions, but she had trouble remembering multi-step or complex instructions, which had to be broken down and repeated. . . . Her memory at this time will lead to significant difficulties. Her issues with maintaining focus are such that she would have great difficulty remembering instructions, especially detailed or complex instructions. . . .
>
> Work pace is slowed by confusion and lapses in attention such that she has to be reminded of what she is doing. . . .
>
> [H]er difficulties with impairment in attention/concentration functioning would make it difficult to remember communications with others which would likely frustrate others in a workplace environment. Coworkers may also tire of her requests for assistance with recalling what she has been told to do. . . .
>
> She would have difficulty responding to work pressures on a full time basis due to her concentration impairment and emotional issues related to depression and anxiety.

(ECF No. 12, PageID #: 402–03). The ALJ considered the opinion and stated: "The undersigned finds this opinion persuasive to the extent it supports the moderate mental limitations given in the above residual functional capacity." (ECF No. 12, PageID #: 109).

## IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

> 3. The claimant has the following severe impairments: labial hypertrophy with pelvic pain, status post labiaplasty, multiple sclerosis, asthma, and depressive disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of

7

> the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can never climb ladders, ropes, and scaffolds, she should avoid concentrated exposure to extreme temperatures, she should avoid concentrated exposure to pulmonary irritants and unprotected heights, she is limited to performing simple tasks and following simple instructions, she should not be required to work at a fast pace production environment (i.e. assembly line work), and she would be able to appropriately socialize, but with the general public it should be brief and superficial and occasional with coworkers.

(ECF No. 12, PageID #: 100–01, 103).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be

8

affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

    **B.**    **Standard for Disability**

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

    **C.**    **Discussion**

Young raises two issues on appeal. First, Young asserts that the ALJ's RFC failed to account for Young's multiple sclerosis. Second, Young argues that the ALJ failed to properly evaluate the opinion evidence from Dr. Koricke.

    **1.**    **The ALJ's RFC is Supported by Substantial Evidence**

Young argues that the ALJ failed to properly evaluate the evidence of her multiple sclerosis, resulting in an inaccurate RFC. She asserts that the medical evidence demonstrated progressive worsening of her multiple sclerosis symptoms. Young suggests that the ALJ focused on periods of remission and "left out any analysis whatsoever of 'the intrinsic on-again off-again nature' of Ms. Young's progressive relapsing-remitting multiple sclerosis." (ECF No. 16 at 14 (citations omitted)). The Commissioner responds that Young mischaracterizes the evidence and the ALJ accommodated all credible limitations arising from the evidence.

In making her argument, Young relies on *Parish v. Califano*, 642 F.2d 188 (6th Cir. 1981). There, the ALJ found that a claimant who suffered from multiple sclerosis was not disabled because she attended college and was employed for nine months during a period of remission. *Id.* at 191–92. The Sixth Circuit concluded that the ALJ erred by placing undue reliance on the claimant's period of remission. *Id.* at 193. In remanding the case, the court stated: "Multiple sclerosis is an incurable, progressive disease subject to such periods of remission and exacerbation. Other courts have recognized both these aspects of disabling diseases in dealing with social security claimants who are victims of multiple sclerosis or similar diseases." *Id.* The court further reasoned that in cases involving conditions episodic in character, such as multiple sclerosis, consideration should be given to frequency and duration of exacerbations and lengths of remissions. *Id.* Young alleges that this case supports her argument that the ALJ erred by relying on periods of remission instead of her periods of worsening.

The difference between *Parish* and this case, however, is that the ALJ did not unduly focus on periods of remission and ignore periods of exacerbation in crafting his RFC. Instead, the ALJ thoroughly considered the medical record and appropriately determined that Young's multiple sclerosis did not require additional postural limitations even in times periods of exacerbation.

Specifically, the ALJ relied on findings of "5/5 motor strength proximally and distally bilaterally, normal muscle tone, normal finger-nose-finger testing, no finger to nose dysmetria, no alternating hand movement ataxia unremarkable sensation to light touch, intact cranial nerves, stable or normal gait, a full range of motion of all extremities, . . . and negative Romberg's testing." (ECF No. 12, PageID #: 108). Although Young correctly points out that there is evidence of numbness, tingling, and dizziness, even when reporting such symptoms, Young had 5/5 strength, normal muscle tone, and other normal findings that the ALJ relied on. (ECF No. 12, PageID #: 763). For example, Young emphasizes that she went to the hospital for a headache and dizziness. The medical notes from the visit, however, indicate that Young's sensory and motor function were intact, she had no finger to nose dysmetria, and no alternating hand movement ataxia. (ECF No. 12, PageID #: 619–20). Similarly, when she reported numbness and tingling in her legs and stated that she felt like she would fall, the medical notes demonstrated that Young had normal finger-nose-finger testing, 5/5 motor strength, normal muscle tone, and negative Romberg testing. (ECF No. 12, PageID #: 763). Again, when Young reported that she felt her legs would give out on her when standing for long periods at work, the medical exam indicated normal finger-nose-finger testing, 5/5 strength, normal muscle tone, stable gait, and negative Romberg testing. (ECF No. 12, PageID #: 753–54). Thus, Young mischaracterizes the ALJ's analysis of the medical record. Unlike in *Parish*, the ALJ did not ignore the evidence of Young's multiple sclerosis flare-ups (hospital visits and reports of tingling and numbness). He simply relied on the normal findings present during these periods. It was proper for the ALJ to rely on such evidence in determining Young's RFC. The Court, therefore, concludes that the ALJ properly considered all of the medical evidence, including evidence of "worsening symptoms," and supported his RFC determination with substantial evidence.

Additionally, the ALJ found the opinions of the State Agency physicians and the consultative physical examiner persuasive, each of whom opined that Young did not have limitations in standing, sitting, lifting, or any other postural category. These opinions provide additional support for the ALJ's RFC determination. Nevertheless, Young argues that the ALJ erred in relying on these opinions because they were not supported by the medical record. This argument spans only a paragraph at the end of Young's RFC challenge and makes essentially the same argument. Young asserts that each of the state reviewers and the consultative physical examiner erred by stating Young has no postural limitations despite evidence of a trip to the emergency room, dizziness, headaches, and fall risks. However, as the Court discussed above, the opinions were supported by normal findings present during these multiple sclerosis "flare-ups." The ALJ specifically relied on findings of 5/5 motor strength, normal muscle tone, normal finger-nose-finger testing, no finger to nose dysmetria, no alternating hand movement ataxia, stable or normal gait, a full range of motion of all extremities, and negative Romberg's testing in crediting each of the opinions. Young does not dispute the accuracy of these findings but instead appears to ask the Court to reweigh the evidence in her favor. That is not the role of the Court. The Court's role is simply to consider whether the ALJ followed the proper regulations and supported his decision with substantial evidence. The Court concludes that the ALJ properly concluded that the State Agency physicians' and consultative physical examiner's opinions were consistent with the objective medical findings. Young does not argue that the ALJ improperly considered the supportability of the opinions. There is no reason, therefore, to disturb the ALJ's analysis of the state agency reviewers' and physical consultative examiner's opinion evidence or his RFC determination.

    2.    **The ALJ Properly Evaluated Dr. Koricke's Opinion**

Young next argues that the ALJ erred in his analysis of the consultative psychological examiner's—Dr. Koricke—opinion. At Step Four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." C.F.R. § 404.1520c(a). Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. *Id*. In doing so, the ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. *Id.* § 404.1520c(b)(2). If the ALJ finds an opinion persuasive, it is "well-established" that the ALJ does not need to adopt all the findings in the opinion when determining the RFC. *Fiktus v. Kihakazi*, No. 1:20CV1689, 2021 WL 5567866, at *9 (N.D. Ohio July 29, 2021) (citations omitted), *report and recommendation adopted sub nom. Fiktus v. Comm'r of Soc. Sec.*, No. 1:20-CV-01689, 2021 WL 5566805 (N.D. Ohio Nov. 29, 2021)). However, although there is no requirement that the ALJ adopt opinions he finds persuasive "verbatim," the ALJ is still required to explain why he did not adopt a portion of an opinion if the RFC conflicts with it. *Kearns v. Comm'r of Soc. Sec.*, No. 3:19 CV 01243, 2020 WL 2841707, at *13 (N.D. Ohio Feb. 3, 2020); *see also Stoodt v. Comm'r of Soc. Sec.*, 2022 WL 721455, at *15 (N.D. Ohio Jan. 13, 2022).

Dr. Koricke opined that Young had trouble with memory, attention, and concentration. She noted that Young had "trouble remembering multi-step or complex instructions, which had to be broken down and repeated." (ECF No. 12, PageID #: 402). She suggested that Young's memory would cause "significant difficulties." (ECF No. 12, PageID #: 402). She also opined that Young's focus issues would lead to "great difficulty remembering instructions, especially detailed or

complex instructions." (ECF No. 12, PageID #: 402–03). According to Dr. Koricke, these difficulties would frustrate others in a workplace environment because coworkers may tire of Young's requests for assistance with recalling instructions. (ECF No. 12, PageID #: 402). She also reported that confusion caused a slower work pace. (ECF No. 12, PageID #: 402). Finally, Dr. Koricke opined that Young "would have difficulty responding to work pressures on a full time basis due to her concentration impairment and emotional issues related to depression and anxiety." (ECF No. 12, PageID #: 403).

The ALJ found this opinion persuasive "to the extent it supports the moderate mental limitations given" in his RFC. (ECF No. 12, PageID #: 109). He explained:

> It is somewhat supported by the significant mental status findings from the consultative psychological examination that include appearing depressed, exhibiting long latencies when responding to questions and problems with distractibility and inattention, difficulty expressing herself in that she would lose her train of thought and her memory for history was varied, bring notes to refer to, struggling to maintain attention and concentration, needing lengthy or complex instructions to be broken down into small segments of information and repeated because of limited sustained attention, presenting with a flat affect and a restricted range of emotions, low appearing energy and motivation, fair to poor memory for history, and losing focus during serials sevens and having to start the task over. (4F). It is somewhat consistent with the opinions of the State Agency physicians and the testimony of the claimant regarding her alleged level of limitation due to her severe mental impairment.

(ECF No. 12, PageID #: 109–10).

The Court first notes that Young does not argue that the ALJ failed to discuss the supportability and consistency of Dr. Koricke's opinion. Instead, Young argues the ALJ's reliance on this opinion to support "moderate mental health limitations" is misplaced. She suggests that Dr. Koricke's opinion supports severe mental health limitations and it, therefore, contradicts the ALJ's RFC. The Commissioner responds that the ALJ incorporated all of Dr. Koricke's limitations into

14

the RFC and in the hypothetical given to the vocational expert. First, to accommodate Dr. Koricke's statement that Young would have difficulty remembering detailed or complex instructions, the ALJ limited Young to simple tasks and following simple instructions. Second, to accommodate Koricke's opinion that Young's work pace would be slow, the ALJ stated that Young could not work in a fast-paced production environment. Next, to accommodate Dr. Koricke's suggestion that Young may frustrate others in the workplace, the ALJ limited Young to only occasional interaction with coworkers. Finally, to accommodate Dr. Koricke's conclusion that Young would have difficulty responding to workplace pressures, the ALJ limited Young to few, if any, workplace changes. Moreover, the Commissioner argues that any error in the ALJ's analysis of Dr. Koricke's opinion would have been harmless because the ALJ found the state agency opinions persuasive and the state agency psychologists reviewed Dr. Koricke's opinion. Notably, despite filing a reply brief, Young failed to respond to either argument.

The Court agrees with the Commissioner. As the Commissioner argued and the Court recited above, the ALJ accommodated each of Dr. Koricke's statements by providing specific limitations in the RFC regarding her findings. Young does not explain how the limitations do not accommodate Dr. Koricke's opinion. She simply states that Dr. Koricke's suggestions result in severe limitations and, as a result, the ALJ's RFC does not follow from the evidence. The only time Young even attempted to give an explanation regarding a particular suggestion, she stated: "All the limitations recited above, and particularly the final limitation regarding difficulties responding to work pressures on a full-time basis, contradict the ALJ's finding that Dr. Koricke's opinion is 'persuasive to the extent it supports the moderate mental health limitations given in the above residual functional capacity.'" (ECF No. 16 at 18–19). This statement still fails to sufficiently explain Young's argument, providing no suggested limitations or caselaw to support

15

the assertion. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (alteration in original) (citations and quotation marks omitted)). Moreover, the Court concludes that the ALJ properly accommodated this "workplace pressure" statement because he limited Young to simple tasks, simple instructions, and a slower work pace—limiting the amount of pressure Young would face.[2] This RFC is not inconsistent with Dr. Koricke's limitations.[3] Thus the ALJ was not required to explain his decision not to adopt the suggestion verbatim. *See Kearns*, 2020 WL 2841707, at *13. Accordingly, the Court finds no reason to disturb the ALJ's decision.

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Young's Statement of Errors and AFFIRM the Commissioner's decision.

Dated: June 22, 2022

                                            s/ *Carmen E. Henderson*
                                            CARMEN E. HENDERSON
                                            U.S. MAGISTRATE JUDGE

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530–31 (6th Cir. 2019).

---

[2] The jobs the VE provided also require few changes. (ECF No. 12, PageID #: 127).
[3] The Court also notes that in explaining why the ALJ found that Young had only a moderate limitation in adapting and managing herself, the ALJ reasoned that Young had been able to work above substantial gainful activity levels during this period.